# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD., and SCOOP
REAL ESTATE, L.P.,

     Plaintiff,                     Case No.:

v.

EDWARD STEINHAUSER and DIANE
SCHWAB,

     Defendants.
_____/

## COMPLAINT

Burton W. Wiand (the "Receiver"), as Receiver for Valhalla Investment Partners,

L.P. ("Valhalla Investment"); Viking Fund, LLC ("Viking Fund"); Viking IRA Fund, LLC,

("Viking IRA Fund"); Victory Fund, Ltd. ("Victory Fund"); Victory IRA Fund, Ltd.

("Victory IRA Fund"); and Scoop Real Estate, LP ("Scoop Real Estate") (collectively, the

"Hedge Funds"),[1] by and through his undersigned counsel, hereby files suit against Edward

---

[1]     Mr. Wiand also was appointed Receiver for Scoop Capital, LLC ("Scoop Capital"); Scoop Management, Inc. ("Scoop Management'); Valhalla Management, Inc. ("Valhalla Management"); Viking Management, LLC ("Viking Management"); Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; Laurel Mountain Preserve Homeowners Association, Inc; Marguerite J. Nadel Revocable Trust UAD 8/2/07; Guy-Nadel Foundation, Inc.; Lime Avenue Enterprises, LLC; A Victorian Garden Florist, LLC; Viking Oil and Gas, LLC; and Home Front Homes LLC, but he does not sue on their behalf. Collectively, all of the entities in receivership are referred to as the "Receivership Entities."

Steinhauser and Diane Schwab, jointly and severally (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1.     The United States District Court for the Middle District of Florida originally appointed Mr. Wiand as Receiver for the Hedge Funds by Order Appointing Receiver dated January 21, 2009, and subsequently reappointed him Receiver by Order Reappointing Receiver dated June 3, 2009 (collectively, the "Orders Appointing Receiver").

2.     The Court entered the Orders Appointing Receiver in an enforcement action brought by the Securities and Exchange Commission (the "Commission") styled, *Securities and Exchange Commission v. Arthur Nadel et al.*, Case No. 8:09-cv-87-T-26TBM (M.D. Fla.) (the "Commission Proceeding").

3.     The Receiver was appointed pursuant to the Court's inherent equity powers to carry out the purposes of the Commission Proceeding, which was brought pursuant to Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Commission Rule 10b-5.

4.     In accordance with 28 U.S.C. § 754, the Receiver filed a copy of the Commission Proceeding complaint and a copy of the Order Reappointing Receiver in the United States District Court for the District of Colorado within ten days of that Order.

5.     Under the Orders Appointing Receiver, to carry out the Commission's mandates and the purposes of the Commission Proceeding, the Receiver was directed to, *inter alia*, administer and manage the business affairs, funds, assets, choses in action and any other property of the Hedge Funds and of the rest of the Receivership Entities; marshal and

safeguard all of the assets; and take whatever actions necessary for the protection of the investors, including instituting legal proceedings against individuals or entities that have wrongfully or improperly received funds or other proceeds directly or indirectly traceable from investors in the Hedge Funds.

6.     The Receiver brings this action to recover money transferred to Defendants from the Hedge Funds in an amount that exceeds the amount invested by Defendants in the Hedge Funds.

## JURISDICTION AND VENUE

7.     On information and belief, defendant Edward Steinhauser is a resident of Denver County, Colorado.

8.     On information and belief, defendant Diane Schwab is a resident of Denver County, Colorado.

9.     The Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 754, and principles of ancillary or supplemental jurisdiction under 28 U.S.C. § 1367.   This Complaint is brought to accomplish the objectives of the Orders Appointing Receiver, and thus this matter is ancillary to the Court's exclusive jurisdiction over the receivership estate.

10.     The Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §§ 754 and 1692.

11.     Venue in this District and Division is proper under 28 U.S.C. § 754 as this action is related to the Commission Proceeding pending in this District and the Receiver was appointed in this District.

## THE PARTIES

12.     Burton W. Wiand is the duly appointed and acting Receiver for the Receivership Entities.  The Receivership Entities on whose behalf the Receiver asserts the claims in this complaint are: (1) Valhalla Investment; (2) Viking Fund; (3) Viking IRA Fund; (4) Victory Fund; (5) Victory IRA Fund; and (6) Scoop Real Estate.

13.     Arthur Nadel ("Nadel"), through Scoop Capital and Scoop Management and, along with Christopher Moody ("Chris Moody") and Neil Moody ("Neil Moody") (Chris Moody and Neil Moody are collectively referred to as the "Moodys"), through Valhalla Management and Viking Management (Scoop Capital, Scoop Management, Valhalla Management, and Viking Management are referred to collectively as the "Fund Managers"), managed the Hedge Funds and misrepresented their performance.

14.     Nadel defrauded investors through his control of the Fund Managers and of the Hedge Funds.  Before committing this fraud, Nadel had been disbarred from the practice of law in New York State in a publicly disseminated decision.

15.     A large number of investors in the Hedge Funds received no distributions from the Hedge Funds of purported trading or other investment profits (collectively, "trading profits") and/or of purported principal redemptions, or they received such distributions in an amount that was less than the amount they invested.  As such, each of those investors suffered a net loss.

16.     On the other hand, a portion of investors received distributions from the Hedge Funds of purported trading profits and/or of purported principal redemptions in an

amount that exceeded the amount they invested. As such, each of those investors experienced a net gain, which is referred to herein as "false profits."

17.     Defendants were among the investors who experienced false profits. In other words, Defendants received distributions of purported trading profits or purported principal redemptions in connection with their investment in one or more of the Hedge Funds which exceeded the amount they invested. The Receiver seeks to avoid transfers to Defendants, jointly and severally, under the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101, *et seq.* ("FUFTA"), in an amount equivalent to the false profits enjoyed by Defendants. In the alternative, the Receiver seeks disgorgement of that amount pursuant to equitable claims of unjust enrichment.

**The Hedge Funds**

**Valhalla Investment**

18.     Valhalla Investment is a Delaware Limited Partnership formed in March 1999 which, until January 2009, did business in Sarasota, Florida as a private placement investment fund.

19.     At all relevant times, Valhalla Investment's General Partner was Valhalla Management. Valhalla Management was also the manager of Valhalla Investment and was responsible for administering all facets of Valhalla Investment, including its investment and trading activities.

20.     Valhalla Management charged fees to and collected fees from Valhalla Investment for its purported management services. Those fees included (a) a quarterly "Performance Allocation" that was calculated as a percentage of purported net profits from

investment and trading activities and (b) a monthly "Management Fee" that was calculated as a percentage of the purported net asset value of the fund.

21.     Pursuant to its responsibility to administer Valhalla Investment's investment and trading activities, Valhalla Management "retained" Nadel and an entity he formed, owned, and controlled, Scoop Management, as the investment advisor.  As the investment advisor, Nadel purported to direct and execute the vast majority of Valhalla Investment's investment and trading activities, and also provided office space, office management, and all "back office" services.

22.     In return for Nadel's purported services, Valhalla Investment paid Scoop Management a flat monthly "Service Fee."  Further, Valhalla Management paid Scoop Management a portion of the fees it collected from Valhalla Investment.

23.     Valhalla Investment is a creditor of Nadel under FUFTA.

24.     Valhalla Investment is owned, in part, by the limited partners (or investors) who invested in the fund in return for limited partnership interests.

**Viking Fund**

25.     Viking Fund is a Delaware Limited Liability Company formed in March 2001 which, until January 2009, did business in Sarasota, Florida as a private placement investment fund.

26.     At all relevant times, Viking Funds' Managing Member was Viking Management.  Viking Management was also the manager of Viking Fund and was responsible for administering all facets of Viking Fund, including its investment and trading activities.

27.    Viking Management charged fees to and collected fees from Viking Fund for its purported management services.   Those fees included (a) a quarterly "Performance Allocation" that was calculated as a percentage of purported net profits from investment and trading activities and (b) a quarterly "Management Fee" that was calculated as a percentage of the purported net asset value of the fund.

28.    Pursuant to its responsibility to administer Viking Fund's investment and trading activities, Viking Management "retained" Nadel and Scoop Management as the investment advisor.  As the investment advisor, Nadel purported to direct and execute the vast majority of Viking Fund's investment and trading activities, and also provided office space, office management, and all "back office" services.

29.    In return for Nadel's purported services, Viking Fund paid Scoop Management a flat monthly "Service Fee."   Further, Viking Management paid Scoop Management a portion of the fees it collected from Viking Fund.

30.    Viking Fund is a creditor of Nadel under FUFTA.

31.    Viking Fund is owned, in part, by the members (or investors) who invested in the fund in return for membership interests.

**Viking IRA Fund**

32.    Viking IRA Fund is a Delaware Limited Liability Company formed in March 2001 which, until January 2009, did business in Sarasota, Florida as a private placement investment fund.

33.    At all relevant times, Viking IRA Fund's Managing Member was Viking Management.   Viking Management was also the manager of Viking IRA Fund and was

responsible for administering all facets of Viking IRA Fund, including its investment and trading activities.

34.     Viking Management charged fees to and collected fees from Viking IRA Fund for its purported management services.  Those fees included (a) a quarterly "Performance Allocation" that was calculated as a percentage of purported net profits from investment and trading activities and (b) a quarterly "Management Fee" that was calculated as a percentage of the purported net asset value of the fund.

35.     Pursuant to its responsibility to administer Viking IRA Fund's investment and trading activities, Viking Management "retained" Nadel and Scoop Management as the investment advisor.  As the investment advisor, Nadel purported to direct and execute the vast majority of Viking IRA Fund's investment and trading activities, and also provided office space, office management, and all "back office" services.

36.     In return for Nadel's purported services, Viking IRA Fund paid Scoop Management a flat monthly "Service Fee."  Further, Viking Management paid Scoop Management a portion of the fees it collected from Viking IRA Fund.

37.     Viking IRA Fund is a creditor of Nadel under FUFTA.

38.     Viking IRA Fund is owned, in part, by the members (or investors) who invested in the fund in return for membership interests.

**Victory Fund**

39.     Victory Fund is a Florida Limited Partnership which, until January 2009, did business in Sarasota, Florida as a private placement investment fund.  Prior to November

8

2002, Victory Fund was known as Scoop Investments, LP ("Scoop Invesments"). Scoop Investments was formed in May 2001.

40.    Beginning in December 2002, Victory Fund's General Partner was an entity formed, owned, and controlled by Nadel, Scoop Capital. Before that time, Victory Fund's and its predecessor's, Scoop Investments', General Partner was Intex Trading Corp., another company formed, owned, and controlled by Nadel.

41.    Nadel and Scoop Management were the "Investment Manager," or investment advisor, of Victory Fund. As the investment advisor, Nadel purported to direct and execute Victory Fund's investment and trading activities, and also provided office space, office management, and all "back office" services.

42.    In return for Nadel's purported services, Victory Fund paid Scoop Management (a) a quarterly "Management Fee" that was calculated as a percentage of the purported net asset value of the fund and (b) a flat monthly "Service Fee."

43.    Victory Fund is a creditor of Nadel under FUFTA.

44.    Victory Fund is owned, in part, by the limited partners (or investors) who invested in the fund in return for limited partnership interests.

**Victory IRA Fund**

45.    Victory IRA Fund is a Florida Limited Partnership formed in March 2003, which, until January 2009, did business in Sarasota, Florida as a private placement investment fund.

46.    At all relevant times, Victory IRA Fund's General Partner was Scoop Capital.

47.   Nadel and Scoop Management were the "Investment Manager," or investment advisor, of Victory IRA Fund.  As the investment advisor, Nadel purported to direct and execute Victory IRA Fund's investment and trading activities, and also provided office space, office management, and all "back office" services.

48.   In return for Nadel's purported services, Victory IRA Fund paid Scoop Management (a) a quarterly "Management Fee" that was calculated as a percentage of the purported net asset value of the fund and (b) a flat monthly "Service Fee."

49.   Victory IRA Fund is a creditor of Nadel under FUFTA.

50.   Victory IRA Fund is owned, in part, by the limited partners (or investors) who invested in the fund in return for limited partnership interests.

**Scoop Real Estate**

51.   Scoop Real Estate is a Delaware Limited Partnership formed in October 2003 which, until January 2009, did business in Sarasota, Florida as a private placement investment fund.

52.   At all relevant times, Scoop Real Estate's General Partner was Scoop Captial. Scoop Capital was also the manager of Scoop Real Estate and was responsible for administering all facets of Scoop Real Estate, including its investment and trading activities.

53.   Scoop Capital charged fees to and collected fees from Scoop Real Estate for its purported management services.  Those fees included (a) a periodic allocation to it of a percentage of the fund's net profits; (b) a periodic allocation to it of a percentage of the gross profits generated by the sale of certain fund assets; and (c) a quarterly "Management Fee" that was calculated as a percentage of the purported net asset value of the fund.

10

54.     Pursuant to its responsibility to administer Scoop Real Estate's investment and trading activities, Scoop Capital "retained" Nadel and Scoop Management as the investment advisor.  As the investment advisor, Nadel purported to direct and execute the vast majority of Scoop Real Estate's investment and trading activities, and also provided office space, office management, and all "back office" services.

55.     In return for Nadel's purported services, Scoop Real Estate paid Scoop Management a flat monthly "Service Fee."

56.     Scoop Real Estate is a creditor of Nadel under FUFTA.

57.     Scoop Real Estate is owned, in part, by the limited partners (or investors) who invested in the fund in return for limited partnership interests.

**Fund Managers**

**Valhalla Management**

58.     Valhalla Management is a Florida Corporation, was incorporated in February 1999 with its principal place of business in Sarasota, Florida, and acted as the General Partner and manager of Valhalla Investment.

59.     At all relevant times, Neil Moody or Neil Moody and Chris Moody were the sole principals of Valhalla Management.  Further, Neil Moody was its Director and President and Chris Moody was its Vice-President and Treasurer.

60.     Nadel, through Scoop Management, provided investment advisory services to Valhalla Management.  Although the Moodys were the fiduciaries of Valhalla Management, they effectively abdicated control and oversight and allowed Nadel to take charge of Valhalla

Management and, specifically, its investment and trading activities, which allowed Nadel to use Valhalla Management to perpetrate the Ponzi scheme discussed below.

**Viking Management**

61.     Viking Management is a Delaware Limited Liability Company, was formed in May 2001 with its principal place of business in Sarasota, Florida, and acted as the Managing Member and manager of Viking Fund and Viking IRA Fund.

62.     At all relevant times, Neil Moody or Neil Moody and Chris Moody were the sole principals of Viking Management.  Further, Neil Moody was its Managing Member and President and Chris Moody was its Co-Managing Member.

63.     Nadel, through Scoop Management, provided investment advisory services to Viking Management.  Although the Moodys were the fiduciaries of Viking Management, they effectively abdicated control and oversight and allowed Nadel to take charge of Viking Management and, specifically, its investment and trading activities, which allowed Nadel to use Viking Management to perpetrate the Ponzi scheme discussed below.

**Scoop Capital, LLC**

64.     Scoop Capital is a Florida Limited Liability Company, was formed in June 2001 with its principal place of business in Sarasota, Florida, and acted as the General Partner of Victory Fund, Victory IRA Fund, and Scoop Real Estate.

65.     Nadel created, owned, and controlled Scoop Capital and was its President and Managing Member.

66.     Nadel's control of Scoop Capital allowed him to perpetrate the Ponzi scheme discussed below.

67.     Nadel used Scoop Capital to divert proceeds of his Ponzi scheme for his and his family's benefit, including through his control of Scoop Capital's bank and other financial accounts.

**Scoop Management**

68.     Scoop Management is a Florida Corporation and was incorporated in April 2001 with its principal place of business in Sarasota, Florida.

69.     Nadel created and owned Scoop Management and was its President and Director.  Nadel controlled Scoop Management and all of its operations, and performed all of Scoop Management's trading activities for the Hedge Funds.

70.     At all relevant times, Scoop Management was the investment advisor for Valhalla Management and Viking Management and, in that role, provided trading, research, and operational services for Valhalla Management and Viking Management and, more specifically, for Valhalla Investment, Viking Fund, and Viking IRA Fund.

71.     At all relevant times, Scoop Management was the investment advisor for Scoop Capital and, before it became Victory Fund's General Partner, for Intex Trading Corp., and in that role provided trading, research, and operational services for Scoop Capital and Intex Trading Corp. and, more specifically, for Victory Fund and its predecessor Scoop Investments and for Victory IRA Fund and Scoop Real Estate.

72.     In other words, Nadel, through his control of Scoop Management, was responsible for trading and making trading decisions for each of the Hedge Funds and effectively controlled all of the Fund Managers.

73.     Nadel's control of Scoop Management allowed him to perpetrate the Ponzi scheme discussed below.

74.     Nadel used Scoop Management to divert proceeds of his fraudulent scheme for his and his family's benefit, including through his control of Scoop Management's bank and other financial accounts.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.     NO MEANINGFUL DISTINCTION BETWEEN FUND MANAGERS

75.     Although different Hedge Funds had different Fund Managers, in actuality there was no meaningful distinction between the Fund Managers.   Indeed, although each Fund Manager was created by either Neil Moody or Nadel, Nadel and Neil Moody were collaborating from the inception of the first Hedge Fund, Valhalla Investment.

76.     The Fund Managers shared the same office, personnel, office management, back office operations, accountant, and legal counsel.

77.     Further, Nadel and the Moodys frequently referred to the Fund Managers as the "Nadel/Moody Group," described the Hedge Funds as having the "same management team," and referred to the Hedge Funds collectively as "our funds."

78.     The Fund Managers also typically used the same letterhead, with all of the Fund Managers and Hedge Funds listed on it, and periodic correspondence to investors was sent to all investors on behalf of all Fund Managers and Hedge Funds.   Those letters also discussed general performance and strategy across all Hedge Funds.

**B.    THE PONZI SCHEME**

79.    From 1999 through January 2009, over $350 million was raised from approximately 370 investors on behalf of one or more of the Hedge Funds by Nadel and his entities, Scoop Management and Scoop Capital; by the rest of the Fund Managers; and by the Moodys through the offer and sale of securities in the form of interests in the Hedge Funds as part of a single, continuous Ponzi scheme (the "scheme").

80.    The Hedge Funds were actually or effectively controlled by Nadel through his control of Scoop Management and Scoop Capital and the Moodys' abdication of their obligations.

81.    In relevant part, Nadel and the Moodys represented to investors and potential investors that their investment money was or would be used to trade securities, including the QQQQ exchange-traded fund. On information and belief, investors invested with Nadel and the Hedge Funds based on those representations.

82.    The Hedge Funds derived their assets from investors' principal investments.

83.    Although investors' principal investment money was invested with one or more Hedge Funds in accordance with the pertinent investors' instructions, in actuality Nadel treated the Hedge Funds as a single source of money, and investors' money was commingled in the Hedge Funds' accounts.

84.    Nadel traded the money invested in the Hedge Funds in a pooled and commingled fashion through a single master trading account. Specifically, when trading, Nadel would pool all of the available money raised from investors and invested in the different Hedge Funds, along with money in his personal or other non-Hedge Fund accounts

that he controlled (collectively, "Nadel's accounts"), in a single account and use it to purchase securities. Then, at the close of the trading session, Nadel allocated the completed trades as he wished among the accounts of the Hedge Funds and Nadel's accounts. Typically, Nadel allocated profitable trades to Nadel's accounts, including accounts in his name or in the name of Scoop Management or Scoop Capital, and unprofitable trades to the accounts of the Hedge Funds.

85.     The Hedge Funds' investment returns and performance as represented to investors and potential investors from 1999 forward (as applicable based on then existing Hedge Funds) were false and were based on grossly overstated performance numbers created by Nadel. The true results of the trading activity that actually occurred were never reported to investors or potential investors.

86.     Nadel caused the Hedge Funds to pay tens of millions of dollars in fees. Because those fees were based on grossly inflated returns, Nadel improperly and wrongfully diverted money from the Hedge Funds.

87.     Aside from paying fees, Nadel caused the Hedge Funds to make distributions to investors that the investment performance of the Hedge Funds never supported. Through those distributions, Nadel improperly and wrongfully diverted money from the Hedge Funds.

88.     For investors who did not request distributions, fictitious trading and investment profits were "credited" to the investors' purported accounts with the Hedge Funds. These fictitious profits were likewise unsupported by the Hedge Funds' investment performance and only served to further increase the Hedge Funds' insolvency.

89.   The negative cash flow of the Hedge Funds made the eventual collapse of the scheme inevitable.

## C.   NADEL IMPROPERLY CAUSED THE HEDGE FUNDS TO PAY FICTITIOUS TRADING PROFITS AND PURPORTED PRINCIPAL REDEMPTIONS TO INVESTORS

90.   Despite significantly lower and, typically, negative yields (*i.e.*, trading losses), Nadel, the Moodys, and the Fund Managers falsely communicated to investors and potential investors, through monthly "statements," Hedge Funds' "Executive Summaries," and other methods, that investments were generating positive returns and yielding between 11.43% and 55.12% per year.  For most years, they falsely represented the investments were generating returns of between 20% and 50%.

91.   The monthly "statements" and other communications identified the purported positive investment results of Nadel's purported trading "gains" (referred to herein as "trading gains").

92.   Although those representations were false, in furtherance of the scheme Nadel intentionally and wrongfully caused the Hedge Funds to pay investors purported trading gains.  Accordingly, on at least a quarterly basis, Nadel and the Fund Managers caused the Hedge Funds to pay to investors sums of money that were equivalent to the trading gains purportedly earned by those investors as reflected in their "account statements."

93.   Similarly, following requests from investors for redemptions of their principal investments, in furtherance of the scheme Nadel intentionally and wrongfully caused the Hedge Funds to pay relevant investors sums of money that were equivalent to all or part of the principal invested by those investors.

94.     These (and all other) distributions which Nadel caused the Hedge Funds to make to investors were paid from the fruits of the scheme.  Specifically, they were paid almost exclusively from: (1) principal investment money from new investors; (2) existing investors' principal investment money; and (3) additional principal investment money from existing investors.

95.     These distributions were not distributions of actual trading gains or of the recipients' principal investments.

96.     Because the "account statements" did not reflect the true nature of Nadel's and the Hedge Funds' activities, by intentionally and wrongfully causing the Hedge Funds to pay those amounts to investors, Nadel improperly diverted assets of the Hedge Funds to both perpetrate and perpetuate the scheme.

97.     The investors relied upon the fictitious and overstated trading gains purportedly achieved by Nadel and the purported payment of principal redemptions upon request to make additional investments with Nadel and the Hedge Funds and to refer friends, family, and business colleagues to do the same.

98.     The principal investment money from new investors, the existing investors' principal investment money, and the existing investors' additional principal investment money should have been used for the stated purpose of the Hedge Funds' business, which was to trade securities in an effort to generate trading gains, and for Scoop Real Estate, to also invest in real property.

99.     The Hedge Funds were harmed by this unauthorized course of conduct, which was effectuated by Nadel through his control of Scoop Management and Scoop Capital and

his *de facto* control of the rest of the Fund Managers in furtherance of his scheme. This conduct dissipated assets of the Hedge Funds.

### D.   TRANSFERS TO DEFENDANTS

100.   Defendants were investors in one or more of the Hedge Funds and received purported trading gains and/or purported principal redemptions in an amount which exceeded Defendants' principal investment. While Defendants and other investors received such false profits, all but a few of the rest of the investors in the Hedge Funds lost money (the balance of investors neither lost money nor gained false profits).

101.   Specifically, as detailed in Exhibit A attached hereto and incorporated herein, based on the records reviewed by the Receiver as of the filing of this complaint, between 1999 and 2008 Nadel caused one or more of the Hedge Funds to pay purported trading gains and/or purported principal redemptions to Defendants. These distributions are itemized in the "Distributions" portion of Exhibit A, which details the date and amount of each such distribution and the Hedge Fund(s) from which the distribution was paid.[2]

102.   Further, as detailed in Exhibit A, based on the records reviewed by the Receiver as of the filing of this complaint, between 1999 and 2008 Defendants invested an amount in one or more Hedge Funds. Those investments are itemized in the "Deposits" portion of Exhibit A, which details the date and amount of each such deposit and the Hedge Fund(s) with which each deposit was made.

---

[2]   On Exhibit A, "Valhalla" refers to Valhalla Investment; "Viking" refers to Viking Fund; "Viking IRA" refers to Viking IRA Fund; "Victory" refers to Victory Fund; "Victory IRA" refers to Victory IRA Fund; and "Scoop" refers to Scoop Real Estate.

103.   Also as detailed on Exhibit A, in light of those deposits and distributions, the distributions to Defendants exceeded their deposits.   The amount of that excess represents Defendants' false profits, and that amount is itemized on Exhibit A as "False Profits."[3] Defendants' false profits (whatever the final amount is determined to be following discovery) are the amounts the Receiver seeks to recover in this suit.

104.   To allow Defendants to keep their false profits would be inequitable and unjust, including to the investors of the Hedge Funds as a whole.

105.   All money Nadel wrongfully caused the Hedge Funds to transfer or pay to Defendants was diverted and misappropriated by Nadel in furtherance of his scheme.   Thus, all of the money transferred or paid to Defendants was improperly diverted assets of one or more of the Hedge Funds.

## COUNT I

### Florida Statutes § 726: Uniform Fraudulent Transfer Act
### False Profits

106.   The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 105.

107.   By intentionally and wrongfully causing the transfer to Defendants of investors' commingled principal investment money in an amount equivalent to Defendants' false profits from one or more of the Hedge Funds as identified in Exhibit A under the circumstances alleged in this complaint, those and the rest of the Hedge Funds, through the Receiver, have a right to repayment of at least that amount from Defendants.

---

[3]   For defendants with multiple "accounts," Exhibit A lists each of the accounts, and the total false profits sought by the Receiver are calculated by netting the "False Profits" figure for each account.

108.   In light of this right to repayment (and independently because Nadel's conduct alleged in this complaint with respect to the Hedge Funds amounted to embezzlement, breach of fiduciary duty, breach of contract, fraud, and/or other violations of law), the Hedge Funds have a claim against Nadel and consequently are creditors of Nadel under FUFTA. Accordingly, Nadel is a debtor under that act.

109.   The transfers of false profits that Nadel caused the Hedge Funds to make to Defendants were inherently fraudulent because the transfers were made as part of the scheme.

110.   Those transfers were fraudulent under Florida Statutes § 726.105(1)(a) because Nadel caused Hedge Funds to make the transfers with actual intent to hinder, delay, or defraud creditors of Nadel, the Fund Managers, and/or the Hedge Funds.

111.   Those transfers also were fraudulent under Florida Statutes § 726.105(1)(b) because: (a) Nadel caused Hedge Funds to make those transfers; and (b)(i) Nadel, the Fund Managers, and the Hedge Funds were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction; or (ii) Nadel  intended that he, the Fund Managers, and/or the Hedge Funds incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

112.   Those transfers also were fraudulent under Florida Statutes § 726.106(1) because neither Nadel, the Fund Managers, nor the Hedge Funds received a reasonably equivalent value in exchange for those transfers to Defendants, and Nadel, the Fund Managers, and the Hedge Funds were insolvent at all relevant times.

113.   On behalf of the Hedge Funds from which money was transferred to Defendants as identified in Exhibit A, the Receiver is entitled to avoid and recover transfers equal to the amount of false profits that Nadel caused those Hedge Funds to make to Defendants (and to any other pertinent remedy, including those available under Florida Statutes § 726.108).

114.   On behalf of the other Hedge Funds, the Receiver is entitled to avoid and recover those transfers because (i) money was commingled among the Hedge Funds and (ii) Nadel used the Hedge Funds as a single, continuous scheme.

WHEREFORE, the Receiver asks this Court to enter judgment against Defendants, jointly and severally, avoiding transfers from the Hedge Funds in the amount of Defendants' false profits, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT II
### Unjust Enrichment
### False Profits

115.   The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 105.

116.   This unjust enrichment claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

117.   Defendants received a benefit when in furtherance and during the course of the scheme, Nadel wrongfully caused Hedge Funds to transfer money to Defendants in an amount equal to Defendants' false profits.

118.   Defendants knowingly and voluntarily accepted and retained a benefit in the form of those false profits.

119.   The circumstances alleged in this complaint render Defendants' retention of that benefit inequitable and unjust, including to the investors of the Hedge Funds as a whole, so Defendants must pay the Receiver, acting on behalf of the Hedge Funds, the value of the benefit received.

120.   Defendants have been unjustly enriched at the expense of the Hedge Funds (and, ultimately, their investors) in the amount of Defendants' false profits, and the Hedge Funds, through the Receiver, are entitled to judgment in the amount of those false profits.

121.   The Receiver, on behalf of the Hedge Funds, is entitled to the return of that money through disgorgement or any other applicable remedy.

WHEREFORE, the Receiver asks this Court to enter judgment against Defendants, jointly and severally, in the amount of Defendants' false profits, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

/s Gianluca Morello
Gianluca Morello (Trial Counsel)
Florida Bar No. 034997
gmorello@wiandlaw.com
Michael S. Lamont
Florida Bar No. 527122
mlamont@wiandlaw.com
WIAND GUERRA KING P.L.
3000 Bayport Drive, Suite 600
Tampa, FL  33607
Tel. 813.347.5100
Fax 813.347.5155
Attorneys for the Receiver, Burton W. Wiand

## EXHIBIT A

### Edward Steinhauser & Diane Schwab

**DEPOSITS**

| Date | Amount | Deposit to |
|---|---|---|
| 4/29/2004 | $250,000.00 | Valhalla |

**Total Deposits**     $250,000.00

**DISTRIBUTIONS**

| Date | Amount | Distribution From |
|---|---|---|
| 04/06/2005 | $265,000.00 | Valhalla |
| 04/13/2005 | $25,155.84 | Valhalla |
| 06/09/2005 | $5,210.32 | Valhalla |

**Total Distributions**     $295,366.16

**FALSE PROFITS**     **$45,366.16**